Lejeune v. National Union May it please the Court, my name is Elizabeth Hitt. I'm here on behalf of the Lejeune Appellants, and I'm here along with my partner, Robert Ader. Good morning. As you're familiar with the background, you've read the briefs, Your Honors, you'll know there's basically two issues in front of you. One is a contract exclusion that National Union proffers in order to get out from undercoverage. And that particular issue encompasses two smaller issues. One, whether their contract exclusion applies because there's no express contract, which the exclusion requires. And number two, whether the Lejeune's claims arose out of the contractual liability on that express contract. So with regard to the second issue, the Koblenz Agreement, the only issue before your Court is whether the Koblenz Agreement can be enforced against National Union. So going directly to the contract exclusion, the words of the contract exclusion say that the insurer will not be liable for losses in connection with claims made against the insured, alleging arising out of, based upon, or attributable to any actual or alleged contractual liability of allied under any express contract. It's important to note, of course, that National Union bears the burden of proving that allied's negligence and securities violations fall solely and entirely within its contract exclusion. So the jury found an express contract, and your argument is there was no evidence to support that finding? Yes, Your Honor. I'm going to list what I think is potential evidence. One is they heard the testimony of some witnesses and perhaps disbelieved them. There was a financial statement that said the interest rate, which they were told was applying, was 10.5. And in the financial statement, it said that had a three-year term. They commenced their loan in 2007, and three years later, in 2010, they were informed that no payment would be made on the principal. Is that it? That's basically National Union's argument, yes, Your Honor. Okay. I'm just telling you. Is that all the evidence? I believe, and I will explain to you why that's not. And then you tell me that's not enough? Correct. To support the jury verdict? Yes, Your Honor. So in the first instance, the only testimony was from Diane Lejeune and Doug Jacobs. They were the only parties to this conversation, this telephonic conversation, and both of them stated identically we never, ever discussed the issue of a repayment date, no repayment terms whatsoever. We don't know to this date whether the repayment terms would include a balloon payment, whether payments over periods of time, whether there's any kind of, if they didn't make the payment on time, the balloon payment, is there any kind of consequences to that? We don't know any of those because they were never discussed. Now, again, Your Honors, I would say it is National Union's burden to show this. They came forth with no evidence whatsoever. So now what they argue to the jury and what they're arguing to this court is, as Your Honor understood, they're going to argue that there's audited financial statements that show that there's some particular repayment term, whether it's three years, whether it's due on demand, whether it's whatever it is. But these audited financial statements, the Lejeunes never got. The first time they received them was in discovery in the underlying action. These audited financial statements were sent to the jury. Did they say that to the jury? I don't believe they stated that to the jury, and I can't be 100% sure. No, I'm talking about the Lejeunes. Did they testify before the jury? Diane Lejeune did, yes, Your Honor. And did she say before the jury? The jury had the financial statements, right? I believe those were entered into evidence. The audited financial statements. I believe they were, Your Honor. Okay, and did she testify, I never saw them? She testified that she never saw any documents at all that stated anything about a repayment term. Additionally, those – She testified that no repayment date was agreed upon. She testified to that, yes, Your Honor. So the jury could disbelieve her and find that a payment date was agreed upon, if there's other evidence to corroborate that. Exactly, Your Honor. If they had proffered – Ms. Donahue mentioned two other pieces of evidence in her questions, and I think the question is why isn't that enough? It's not enough because, first, they have to show that the Lejeunes actually received it, and they never showed that, number one. Number two, the audited financial statements – Why do they have to show that it has to be received? If it's an oral agreement and then it's written down by somebody somewhere, if there's an oral agreement, why do they have to receive that piece of paper? Because, Your Honor, there's absolutely no meaning of the mines. Again, even if they received that piece of paper, which we say they didn't, the paper has to be relatively clear. It has to say you have a 10 percent interest rate, so therefore your money will come due you in three years or whatever it was. They had a 10.5 percent interest rate, right, because they got that piece of paper. Yes, Your Honor, they did. But, again, when you're dealing with an express contract, they can't rely – The term is the length of the loan, period, right? According to you, that's the missing term. When the principal on the loan will be repaid, and you say that's the missing piece. That is the missing piece, and it's not just as simple as just when it will become due. Again, is there a balloon payment? Will the principal be paid out in periods of time? Who testified about paid on demand? That's interesting that you bring that up. The only person, as far as the plaintiffs go, that say it was payable upon demand was somebody from the Anapolskys. They are not the Lejeunes. These are completely different actions that were tried together in the same place. So that's why the jury could have gotten confused that it was payable upon demand, but it wasn't. Since the financial statements reflected a series of loans, all with payment periods after which it becomes payable on demand, I'm not sure why that's not a piece of evidence. Actually, I'm not following you, and I'm sorry. Well, the idea is if it's a three-year term, that doesn't necessarily mean that you have to pay it that date. It may be after that date you can ask for the principal, otherwise the interest just keeps running, right? A period followed by a payment on demand. You can't demand payment until the three-year period is run. I think that's the idea. Now I understand, Your Honor. In fact, that's what National put in their statement of undisputed facts, which I guess were disputed eventually. Yes, Your Honor. So an interesting date. They also argued that because there is no, and there was no meeting of the minds, no agreement on the repayment date, that it's due on demand. So even as we stand here today, Your Honor, we don't know when it was due. Was it due in three years? Was it due on demand? When was it due? We still don't have an answer to that. And the point, though, being that the Lejeunes had no idea. They had no idea because they're not sophisticated lenders. They ran a mom-and-pop restaurant. So even if they were given these financial statements, they'd have to call through there and connect the dots. It doesn't say, Dear Mr. and Mrs. Lejeune and your daughter, because you have a 10% interest rate, we're telling you right now that the repayment date will be on such and such a day. No documents like that ever came. So to the extent that their financial statements could, even if we got them, show a connect-the-dot kind of thing, that does not make an express term. And, again, I think an express term for repayment date is material. The statements say Note 3 bears interest at 10.5 and is due three years from the date of issuance. Yes, Your Honor. Okay. Assuming that was in an agreement, would that be an express term? Assuming it was an agreement, and yes, Your Honor, then I would have to say that it would be if they wrote a letter. Okay, so that's express enough. We know what it is. Yes, Your Honor. It's interest at 10.5 due three years from date of issuance. That's in the financial statements. It's in the financial statements. And she admits her loan was 10.5. And so the question is, can the jury find that they agreed to that? I don't. And they have a document, the financial statements, acknowledging. Who did the financial statements are of what company? Allied. Allied. Yes, Your Honor. So the Allied's own financial statements show that. It's financial statements that were written to its shareholders and directors, not to its private lenders like the Lejeunes. Okay. I see that my time is up for now, and I'll turn this. That's fine. And you have reserved five minutes for rebuttal. Yes, Your Honor. Thank you. Ms. Graves. May it please the Court, Christine Graves on behalf of the Appley National Union. I'd like to start with Judge Rustani's recitation of the evidence and to add a little bit more to that in support of the jury's verdict. As this Court knows, the standard before the Court is whether any evidence supports the jury's verdict. And we submit there is ample evidence to support the jury's verdict. Ms. Lejeune and the Jacobs had a 20-year investment relationship with Affiliated. She trusted Affiliated, and she didn't hesitate in investing her money with Affiliated, and she didn't hesitate in transferring her money to Allied. For each loan with Allied, I mean, I'm sorry, for each loan with Affiliated, she knew the precise terms of her loan. When she went to transfer her money to Allied, she did so under similar circumstances. She knew the exact amount of the money to be loaned. She knew her exact. She transferred the money, but they started a new loan, right? They did start a new loan, yes. But this is based on in the context of a 20-year investment history with the exact same people. And so the jury was entitled to consider the context of all of the evidence. So she knew the exact amount of money that was going to be transferred to Allied. She knew the exact interest rate, 10.5%, and she knew the money would be repaid. Allied's financial statements present other proof that there were terms of these agreements by the time these audited financial statements were prepared. It makes no difference that the Lejeunes didn't actually see these financial statements. What these audited financial statements serve as is additional evidence proving there were terms. Mr. Jacobs explicitly testified that all of the loans identified in the financial statements included Ms. Lejeunes and her husband and daughter's loans. And those audited financial statements contained express repayment dates. Mr. Jacobs, when asked specifically, did you say anywhere in there that you have $5 million of unsecured loans that have no terms? No, of course not. It was clear by that time that they had terms of the loans. So this was affirmative evidence from which the jury could reasonably conclude that the Lejeunes knew the terms of the agreement or they had discussed terms of the agreement or at a minimum they had agreed to receive the same terms that they had had previously with affiliated. I thought Mr. Jones, Allied's owner and president, said they had no explicit instructions regarding repayment dates. Mr. Jacobs did say that, and the jury was entitled to disbelieve that in the face of contradictory evidence, including the financial statements that he himself reviewed repeatedly before submitting those to the IRS. So the jury was entitled to consider all of this information and determine which assessed the credibility of the witnesses, assessed the credibility of the testimony. I'm curious. What were the terms of the prior loans? How long did they? The terms of the prior loans varied, but the most recent ones that are in the record were she had her and her husband and her daughter had invested roughly $1.5 million, 10.5 percent interest rate with a three-year term. It had been a prior three-year term loan before the transfer to Allied. Correct. It was reasonable for the jury to conclude after considering the credibility of the witnesses. Remember, Mr. Jacobs' testimony contradicted itself several times throughout as to whether an interest rate was discussed. Ms. Lejeune expressly contradicted Mr. Jacobs' testimony, and these two were self-interested witnesses. And so the jury was fully entitled to consider this evidence before it, consider the audited financial statements, and say, we believe that from this evidence they knew the terms, they knew they were going to be repaid, and they knew that they would be under the same conditions as their prior loan. That was a reasonable inference from the evidence that the jury was entitled to conclude,  It's evidence from which a reasonable and impartial jury can determine or can reach different results, which, of course, is the standard that this court applies in reviewing the jury's verdict. So I submit that in addition to Judge Rastani's recitation of the facts, you also look at the history of the relationship between the parties, how they had set up their loans in the past, the continued relationship, the implicit trust Ms. Lejeune placed in Allied, and her no hesitation in transferring her money. And the jury could consider all of that and reach that decision. As I mentioned, it's irrelevant that Lejeune's may not have received the actual financial statements. The point of those financial statements is that they are audited, they are sent to the IRS under penalty of perjury should they have been incorrect, and they showed that there were terms. There were, in fact, terms by the time these financial statements were submitted. There were terms, and the jury found accordingly, and that is supported by the evidence, which is this court's standard. Ms. Hitt mentioned that we didn't know if it was a balloon payment or when those terms would be or how they would be repaid or the circumstances under which they would be repaid. The issue in this case, as presented by the Lejeunes, was did they discuss a repayment term? And the evidence is sufficient to show or sufficient for the jury to conclude that they did, in fact, discuss that. It wasn't that they had to review the financial statements and those created a term of the contract. It's affirmative evidence that they did have these discussions and they did create these express contracts. The due-on-demand argument is an argument that we raised as an alternative right-for-any-reason argument to the extent one were to conclude that there were no evidence of express repayment dates, which we obviously object to and believe the jury was fully supported in its verdict. The cases that we cite in our brief, as well as the statute, show that as far back as the 1800s, statutory and common law has held that if there is no express repayment term in a contract, then the law supplies that missing term. It doesn't mean that's under the law, that's an implied term, that's an implied contract, that doesn't work. I thought you were arguing under express contract, from looking at your papers, that after the three-year term ended, they could make demand for payment. Well, we are arguing that as well, but I would respectfully disagree that a due-on-demand term makes it implied because it's supplied by law. What the courts say in all of the cases about an implied contract, an implied contract is inferred by the conduct of the parties. So, for example, you have a teenager who starts mowing his neighbor's lawn. The neighbor doesn't request that he mow the lawn, but he nonetheless pays him every time he mows the lawn. And so you have something that could give rise to an implied contract, because it's implied by the contract, by the conduct of the parties. That's an implied contract. In this instance, Judge Rastani, you're exactly right, that after it was over, it could be due-on-demand. But also, if you look at the statutory, the statutes that have been in effect since the 1800s up until now, as well as the case law, the law supplies a term. And when the law supplies a term, it's not inferring the term. It is supplying the term. It's not inferring it from anybody's conduct. It's the law saying this is what the term is. There's no missing term. There was a question about the independent auditors or who made the financial statement. I believe that was made by the independent auditors that took all in all the information, found the terms of the contract, and put it in the express agreement. So, in conclusion, I believe the questions that you asked are directly on point. There is sufficient evidence, ample evidence, from which the jury in this case could conclude that there was an express contract based on the history, based on the terms, based on the audited financial statements, which set out the terms, and that the jury was correct and entitled to reach the verdict that they did. Thank you. Ms. Hitt. Thank you, Your Honor. I just want to touch very briefly. My partner just reminded me of this, too. The financial statements, those referenced 2004 notes. The lejeunes didn't come in until 2007. So I'd like also to talk about, because we haven't yet, the securities claim, the arising out of element of this contract exclusion. The lejeunes had a clear-cut securities claim. They brought it under Florida statute. Our argument would be, as you've read, I'm sure, the claim, the securities claim does not arise out of the contract. It arises out of Florida law, Florida statute. So to the extent that there could even be seen an express contract, then certainly the securities claims do not arise out of that contract, but out of Florida law. If Your Honor would like to hear any more on that, otherwise I'd like to move on to the Koblins portion. All right. I'm sorry? That would be fine. Okay. So my first point on the Koblins agreement, and I want to make this very, very clear. National Union conceded that the reasonableness of the Koblins agreement, they conceded to the reasonableness, because it arose from the damages awarded under the securities laws, because we had a securities claim. And they said, unlike the Anapolskys, the lejeunes had the securities claim, so we have no issue with the reasonableness. So really what it comes down to before this court is two things. One is the fact that, and it's undisputed, that National Union denied coverage over and over and over again. It was a clear-cut denial. It was unequivocal. I don't think that National Union even argued that in their brief. The law is very clear. When the insurer denies coverage, that's what enables the insured to take on his own defense and decide how he wants to handle it and enter into a settlement agreement that is enforceable against the insured. Now, the one thing that, of course, the insured has to prove is that it was a wrongful denial of coverage or a wrongful denial of the defense costs. And what I argue to your honors is if there is coverage found, in other words, if the contract exclusion does not apply and there is coverage, then that's it. It was a wrongful denial of coverage. They want to focus more directly on the denial of the defense costs. I think that's almost a side issue at this point because there was such a clear-cut denial of coverage. However, the circumstances of this are very unique in their denial of defense costs. PICC was defending Allied, and it was defending Allied up until almost the end where they entered into a settlement agreement with the Lejeunes and Allied to cover the E&O claims and only the E&O claims. At this point, PICC calls up National Union and says, Hey, just want to let you know we are trying to settle the E&O claims that we may be responsible for, and the D&O claims are going to remain. And there's a very good likelihood that Allied and the Lejeunes are going to enter into some type of a Koblenz agreement to settle those. So I don't know whether you want to come to the table or what. National Union said, You know what, that will, quote, never happen. But it did happen. And it did wrap up in one document, and we concede that. However, as PICC testified, they had no part of the Koblenz portion of that agreement. That was worked out completely between Allied and the Jacobs. And Allied's attorney wrote to National Union one more time and said, Look, I know you've denied coverage and defense before, but what if PICC is no longer defending us? For whatever reason, for any reason at all, what if PICC is no longer defending us and we're hanging out there alone? They came back and they denied coverage and their defense obligations one more time. So, Your Honor, I think that's sufficient to show that the idea that these were only 2004 notes. I looked at the financial statements, and it basically was referring to all the outstanding unsecured notes. At some point, and I don't have it in front of me, but I believe my brief in a footnote speaks of that, and it gives a site to it. Is that in the financial statements themselves? I believe it's in the financial statements themselves. I sure couldn't find it. And I don't even know if I have them with me, the financial statements. The issue is whether it says all outstanding loans in the financial statements. I believe so, Your Honor. Are they in the record excerpt? I do not believe they're in the record excerpt. They were exhibits at trial, though, right? The financials? Yes, the allied financial statements. Yes, Your Honor. Notes to the audited financial statements. If you could look at the appellant's reply brief at footnote four, which is on page four. Okay, I got appellant's reply brief. Where am I looking? Give me a page. I'm sorry, page four? Note four. Page four. Okay. It doesn't say. It's a little ambiguous because it says interest rate loan, three-year, but they're saying that portion of the financial statement is about a private placement offering. I don't know. You're going to have to look at the whole statement. Okay. Do you have anything else? I apologize. I don't have it in front of me. If there are any questions? Yeah. Let's see if your co-counsel has the document in court. I have the cites to the document, Your Honor. I would just like to say that this entire rebuttal was outside the scope of what she argued before. So we have addressed all of these issues in detail in our brief, and we'll stand on those. I won't stand up and argue those now. Okay, but is it 157 is the right site? The financial statements were for 2007-2008, and the cites are 157-34 at page 14 and 157-15 at page 15. Jacob's testified that those financial statements included the Lejeune's loans. Okay. We're going to have to look at Jacob's testimony too, so read together. Okay. I think we have it, and I think your time has expired. Yes. Thank you, Your Honor. If you would like Jacob's testimony, it's document 193 at 127-29. Okay. Thank you.